UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CORINNE ANDREA RATTI,

Plaintiff,

v.

SOCIAL SECURITY ADMINISTRATION,

Defendant.

Case No. 16-cv-03523-DMR

**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 16, 18

Plaintiff Corinne Andrea Ratti ("Ratti") moves for summary judgment to reverse the Commissioner of the Social Security Administration's final administrative decision, which found Ratti not disabled and denied her applications for benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* The Commissioner cross-moves to affirm. For the reasons stated below, the court **denies** Ratti's motion, and **grants** the Commissioner's cross-motion.

I. **PROCEDURAL HISTORY**

On October 31, 2012, Ratti filed a protective application for Social Security Disability Insurance (SSDI) benefits. Administrative Record (AR) 225. On November 7, 2012, Ratti filed an application for supplemental security income benefits. AR 228. Ratti's applications were initially denied on March 21, 2013 and again on reconsideration on October 4, 2013. AR 137-39 (Denial), 146-151 (Reconsideration). On November 15, 2013, Ratti filed a request for a hearing before an Administrative Law Judge (ALJ). AR 152-53. ALJ Serena S. Hong held a hearing on January 22, 2015 during which Ratti appeared and testified, along with vocational expert (VE) Lynda Berkley. AR 41-71.

After the hearing, the ALJ issued a decision finding that Ratti was not disabled. The ALJ determined that Ratti has the following severe impairments: degenerative disk disease, left hip

osteoarthrosis, left shoulder impingement, depression, and anxiety disorder. AR 25. The ALJ also found that Ratti (1) was 49 years old on the date she was last insured and thus was an individual closely approaching advanced age (*see* 20 C.F.R. § 1563); (2) had at least a high school education and was able to communicate in English; (3) did not engage in substantial gainful activity[1] from her alleged onset date of disability of September 23, 2009 through December 31, 2014, the date she was last insured; and (4) was unable to perform any past relevant work through the date she was last insured. AR 25-26, 33-34.

The ALJ found that Ratti retained the following residual functional capacity (RFC): Through the date she was last insured, Ratti could perform light work as defined in 20 C.F.R. § 404.1567(b), except that Ratti could stand and walk for only 4 hours out of an 8-hour workday; could not climb ladders, ropes or scaffolds; could perform other postural maneuvers such as stooping, crouching, or crawling on an occasional basis; would need a cane for any prolonged ambulation; was limited to occasional overhead reaching; could not perform forceful pushing or pulling with the upper extremities; was limited to performing only simple routine tasks with little simple decision making; and was limited to minimal social interaction. AR 28.

The ALJ also concluded that there were jobs that Ratti could perform with such an RFC. AR 34. In so concluding, the ALJ relied on the opinion of the VE, who testified that an individual with such an RFC could perform other jobs existing in significant numbers in the national economy, including officer helper, bench assembler, and small products worker. AR 34.

The Appeals Council denied Ratti's request for review on April 19, 2016. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Ratti then filed suit pursuant to 42 U.S.C. § 405(g).

## II.    THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months.

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

*Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he or she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1.      At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.      At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3.      At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.      At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.      At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

United States District Court
Northern District of California

### III. FACTUAL BACKGROUND

#### A. Ratti's Testimony

At the hearing, Ratti testified to the following: Ratti was born in March 1965 and was 50 years old as of the date of the hearing. AR 45. She is right-handed. AR 47. Her highest level of education is the twelfth grade. AR 47. She lives with her husband. AR 45. Although she has a driver's license, her husband drove her to the hearing due to the side effects of her medications. AR 46.

Regarding her work history, Ratti received some training as a dental assistant. AR 47. It is unclear from her testimony whether she also received training as a medical office assistant. Ratti last worked in 2009, when she was employed as a customer service agent. She would call hospitals to determine if they needed medical samples and then would input the orders. AR 48. In 2007, Ratti worked as a food server for approximately six months, taking lunch orders by telephone. AR 49. She also worked as a helper for an elderly woman and performed various tasks including cleaning the house, picking up food, driving to appointments, helping her get in and out of bed, helping her take a bath, and helping her take medications. AR 49-50. It is unclear from her testimony when this work occurred. Ratti also worked for a printing company for a few months, but did not recall the year. AR 50.

Ratti believes she is disabled and cannot work because of lower back, hip, and shoulder injuries, and the medications she takes. AR 50-51. She experiences side effects from medications, including sleepiness, dizziness, nausea, and difficulty staying focused and remembering things. AR 51.

Regarding lower back and hip pain, Ratti experiences pain that travels from the lower back down her left leg and out to her toes. AR 51. The pain is burning and throbbing. AR 52. When seated, Ratti gradually experiences numbness and tingling and pounding pain in her hip, and burning and throbbing pain in the back, after approximately 10-15 minutes. AR 52-53. Ratti stood up during the hearing due to back and hip pain. AR 52. She also experiences numbness and tingling in the left leg when she stands and walks. AR 52. Ratti can walk about 5-10 minutes before she has to stop. AR 53. Ratti used a cane on the date of the hearing and has been using a

cane for the past four years. AR 53. Dr. Dixit prescribed the cane to assist her with ambulation. AR 53. She uses the cane to avoid falling, as her left hip gives out as she is walking. AR 54. Ratti takes daily medication for the pain. AR 54. On average, on a scale of zero to 10, she experiences daily pain at a level of six or seven. AR 54.

Ratti had surgery on her left shoulder in July 2010 and again in 2011. AR 54. It did not heal well after the first surgery and she developed a bone spur. AR 54. After the second surgery, Ratti did not start receiving physical therapy until almost a year later, resulting in further healing problems. AR 55. Ratti experiences problems keeping her left arm lifted, carrying anything over 5 pounds, and keeping her arm out in front of her. AR 55. She feels a sharp and stabbing pain in her left hand when she tries to hold things. AR 55.

Ratti feels the same pain in the right shoulder that she did with the left shoulder before the surgeries. AR 56. She describes the pain as stabbing, like "[her] bone is coming out of [her] skin." The pain is constant and aggravated by anything she does, and travels down to her hands; as a result, Ratti cannot stretch her fingers out fully. AR 56-57. She has difficulty grabbing items with her right hand and can lift less than 5 pounds with it. AR 57. While medications help with shoulder pain, a certain amount of pain is "always with [her]." AR 57. Ratti is limited in the daily chores she can do. She can put bowls and dishes to the side, heat up food in the microwave, and make a sandwich. AR 57-58. She cannot do laundry, wash dishes, or cook. AR 58. Ratti cannot lift a gallon of milk from the refrigerator and put it on the counter. AR 58. Due to the pain in her arms, Ratti experiences difficulty performing personal grooming tasks such as washing her hair and getting dressed. Ratti's husband helps her bathe and get dressed. AR 58. Ratti also has anxiety and depression. AR 58-59. She testified that she feels sad all the time, and that her emotional state "is just in a rut." She stated "I used to be very active and I can't do the things that I used to do or work." AR 59. When she experiences anxiety, she feels like she is "going to have a heart attack." Ratti testified that when an anxiety attack is coming on, "everything tightens up, my mouth and my hands, and I can't move. It just stiffens up like this and I get those several times a month. They come on a lot more than they used to." AR 59-60. Ratti experienced anxiety attacks more frequently after the December 2008 work-place injury in which she fell off a

5

broken chair that was left in the breakroom at her job. AR 60. Anxiety medications help, but do not prevent them. AR 60. Ratti does not know what triggers the anxiety attacks. AR 60. She is not receiving any psychiatric treatment for anxiety and depression, and takes medication for anxiety only. AR 59.

### B.    Relevant Medical Evidence

#### 1.    Treating Providers

##### a.    Castro Community Health Network

Ratti sought treatment at Castro Community Health Network from 2007-2011 for various ailments including back and hip pain and panic attacks, and pain medications refills. AR 323-29. According to two undated handwritten notes, Ratti received refills for Vicodin for low back pain, pain in the left hip, and being under stress. AR 325-26. As noted in a June 10, 2010 progress note, Ratti spoke to a nurse over the phone because she was anxious to get a Soma refill due to lower back pain. AR 324. During the call, Ratti admitted she had not been seen for over a year, but claimed that Dr. Strauss had given her refills anyway. AR 324. According to an August 31, 2010 progress note, Ratti was provided refills for Soma and Vicodin, but would not be given additional refills until she was seen by a provider. AR 324. There are no records showing Ratti was seen after 2011 at this facility.

##### b.    Rakesh K. Dixit, M.D.

Rakesh K. Dixit, M.D. treated Ratti from December 2008 to April 2013 for lumbar spine radiculopathy and degenerative disc disease. *See, e.g*., AR 367-91, 488-514. Of particular significance to the ALJ's decision are two residual functional capacity (RFC) assessments completed by Dixit on November 15, 2012 (AR 464-66) and April 4, 2013 (AR 515-16).

On November 15, 2012, Dixit completed an RFC assessment in which he opined that Ratti was not physically capable of working a 8-hour day, 5 days a week job on a sustained basis. AR 465. Dixit diagnosed Ratti with lumbar spine radiculopathy and assessed her prognosis as "guarded. AR 464. Dixit noted that Ratti experienced pain and fatigue that was constantly severe enough to interfere with the attention and concentration required to perform simple work-related tasks, and that Ratti would need to recline or lie down in excess of the typical 15-minute break in

the morning, 30-60 minute lunch break, and 15-minute break in the afternoon. AR 464. Dixit opined that Ratti's functional limitations were as follows: Ratti could walk less than one city block without rest or significant pain; could sit for 20 minutes and stand/walk for 15 minutes at a time; could sit for 1 hour and stand/walk for 1 hour in an 8-hour workday; needed a job that permitted shifting positions at will from sitting, standing or walking; needed to take 10-15 minute unscheduled breaks every hour during a 8-hour workday; could frequently lift less than 10 pounds and could occasionally lift 10 pounds; and could use her right and left hand 50% of a 8-hour work day grasping, turning and twisting objects, 75% of a 8-hour workday performing fine manipulation, and 50% of a 8-hour workday reaching. AR 465. Dixit estimated that Ratti would likely be absent from work 3-4 times per month as a result of her impairments. AR 465. Dixit opined that Ratti was not a malingerer.

On April 4, 2013, Dixit completed another RFC in which he again opined that Ratti was not physically capable of working a 8-hour day, 5 days a week job on a sustained basis. AR 516. Relevant to the RFC, Dixit diagnosed Ratti with lumbar spine radiculopathy and assessed her prognosis as "guarded." AR 515. Dixit also noted that he had seen Ratti for a follow-up general exam every month since December 24, 2008. AR 515. As with the November 2012 RFC assessment, Dixit observed that Ratti experienced low back pain and hip degenerative disease at a level that was severe enough to interfere with the attention and concentration required to perform simple work-related tasks. AR 515. Dixit again noted that Ratti would need to recline or lie down in excess of the typical 15-minute break in the morning, 30-60 minute lunch break, and 15-minute break in the afternoon. AR 515. Dixit opined that Ratti's functional limitations were as follows: Ratti could walk less than one city block without rest or significant pain; could now sit for only10 minutes and stand/walk for 10 minutes at a time; could sit for 2 hours and stand/walk for 2 hours in an 8-hour workday; needed a job that permitted shifting positions at will from sitting, standing or walking; needed to take a 1-2 day unscheduled break from work every month during a 8-hour workday; could occasionally lift less than 10 pounds; and could use her right and left hand 100% of a 8-hour work day grasping, turning and twisting objects, 100% of a 8-hour workday performing fine manipulation, and 100% of a 8-hour workday reaching. AR 465. Dixit also

7

United States District Court
Northern District of California

estimated that Ratti would likely be absent from work 3-4 times per month as a result of her impairments. AR 465. Dixit again opined that Ratti was not a malingerer. AR 465.

### c.   San Francisco Orthopedic Surgeons Medical Group

Ratti sought treatment at San Francisco Orthopedic Surgeons Medical Group from April 2010 to September 2012 for left hip pain.

On April 29, 2010, Dr. William A. McGann diagnosed Ratti with left hip trochanteric bursitis with traumatic gluteus medius enthesopathy, multiple left hip synovial osteochondromas, and lumbar paracentral pain syndrome, post-traumatic. AR 447. An MRI demonstrated "multiple osseous regions with increased fluid formation within the joint." AR 447. Upon examination, McGann observed that Ratti presented with tenderness more intense in the greater sciatic notch and the central gluteus medius area, and with greater pain over the trochanter area "with more vigorous palpation overlying the bony prominence." AR 447. McGann noted that plain radiographs taken of the left-hip demonstrated "very slight osteophyte formation on the later view of the formal articular margin posteriorly" and "numerous ossification bodies." AR 447.

On July 14, 2010, Ratti returned for a follow-up visit for left hip pain with Dr. Brian Farrell and McGann. AR 444. Upon examination, Farrell and McGann observed that Ratti had tenderness over the area of the greater trochanter on the left side of her left hip, and some tenderness more distally in the lateral aspect of the left hip and thigh. AR 444. They also observed that Ratti had good range of motion in both hips, and had no pain with the external and internal rotation of the left hip. AR 444. Farrell and McGann assessed Ratti with trochanteric bursitis, and scheduled her for a steroid injection. AR 444.

On October 22, 2010, McGann saw Ratti for a follow-up examination of her left hip. AR 443. Ratti reported constant pain and inflammation in the left hip. AR 443. McGann diagnosed Ratti with left hip chronic synovitis, and probable underlying chondromatosis. AR 443. McGann recommended Ratti as a candidate for arthroscopy of the hip. AR 443.

On December 8, 2010, Dr. Jennifer van Warmerdam saw Ratti for left hip pain. AR 441. Upon examination, van Warmerdam observed that Ratti had left hip stiffness, and pain in both internal and external range of motion. AR 441. Van Warmerdam also observed that Ratti had

8

"some trochanteric tenderness to palpation, which [was] really the most significant finding on [the] exam." AR 441. She further observed that Ratti had tenderness to palpation along the mid and lower lumbosacral spinous processes and pain with forward flexion and side bending in the low back. AR 441. Van Warmerdam noted that a review of the plain films of Ratti's left hip showed that she had degenerative changes in her left hip with "maybe some loose bodies within the joint with definite arthritis symptoms." AR 441. She administered a corticosteroid injection to the trochanteric bursa that provided immediate but not complete relief. AR 442.

On April 20, 2011, McGann saw Ratti for left hip pain. AR 439. Ratti described that she was in "so much pain." AR 439. She reported that the topical agents including the Voltaren patch and gel were "better than nothing." AR 439. Upon examination, McGann observed that Ratti's pain presented at the lateral aspect of the hip. AR 439. An injection was administered to the hip, which gave Ratti relief in the first hour. AR 439. McGann opined that the plan was to consider a left hip arthroscopy with debridement. AR 439.

On May 26, 2011, van Warmerdam saw Ratti for left hip pain. AR 436. Upon examination, van Warmerdam observed that Ratti had exquisite tenderness in her left lower extremity to palpation over the greater trochanter. AR 436. She also observed that Ratti had 4/5 strength with abduction of the left leg, "which [was] questionably related to effort and pain." AR 436. Van Warmerdam opined that due to the chronic nature of Ratti's problem, which was not responsive to injections in the greater trochanter, she would get an MRI again to see if any of the loose bodies in the left hip joint had gotten larger or more numerous. AR 436.

On July 27, 2011, van Warmerdam saw Ratti for a follow-up visit on significant left hip pain. AR 433. She noted that Ratti had multiple corticosteroid injections in the hip and trochanteric area, and continued to have discomfort. AR 433. Van Warmerdam also noted that Ratti was unable to sit without difficulty and always had to be at an angle. AR 433. Upon physical examination, van Warmerdam observed that Ratti was in distress secondary to pain, and that examination of the left hip showed significant discomfort with flexion and internal rotation. AR 433. Van Warmerdam discussed excision of loose bodies and synovial debridement of the left hip, but recommended getting a repeat MRI prior to these procedures. AR 433.

On September 25, 2012, van Warmerdam saw Ratti for left hip pain. AR 424-25. She noted that Ratti reported that her pain was primarily located in her lateral thigh and extended down to her foot. AR 424. She also noted that Ratti described that her pain was unchanged since her last visit in May 2012. AR 424. Ratti reported numbness and tingling in the same distribution as her pain, and that she was taking Percocet for the pain, which had been working well. AR 424. Upon examination, van Warmerdam observed that Ratti had pain with her left hip internal rotation and had tenderness to palpation over the lower lumbar spine. AR 424. She noted that x-rays showed "some osteoarthritic spurring in the inferior acetabulum" and that a March 2012 MRI study demonstrated "a stable left trochanteric bursitis with mild osteoarthritic changes of the left hip." AR 424. Van Warmerdam assessed that Ratti's left hip pain was likely second to trochanteric bursitis with an overlying degenerative stenosis component. AR 424. She performed a left hip injection with Lidocaine. AR 424.

### d. James Zucherman, M.D.

McGann referred Ratti to James Zucherman, M.D., who conducted an in-person evaluation of Ratti on May 13, 2013. AR 518-22. Upon physical examination, Zucherman observed that Ratti was mildly obese with more general strength, had an antalgic gait, and her heel and toe gait were both decreased on the left. AR 519. Regarding the range of motion of Ratti's back, Zucherman observed that there was a loss of 75% forward flexion, with pain; a loss of 75% extension, with pain; loss of 75% left side-bending, with pain; loss of 50% right side-bending, with pain; and that there was pain with combined extension and rotation. AR 519. Regarding the range of motion of Ratti's hip, Zucherman observed there was a loss of 75% left hip internal rotation, with pain; a loss of 50% left hip external rotation, with pain; a loss of 50% left hip flexion, with pain; a loss of 50% left hip abduction, with pain; and a loss of 50% left hip abduction, with pain. AR 519. Zucherman observed that Ratti had tenderness at L4-S1 at the left and midline, and tenderness at the left, midline, and anterior of her left hip. AR 520. Zucherman also observed that there was a mild muscle spasm bilaterally in the lumbar spine. AR 520. Zucherman noted that Ratti's lying straight leg raise on the left demonstrated a leg raise to 20 degrees, with pain, and the same raise on the right demonstrated a leg raise of 40 degrees, with

back pain.  AR 520.  Zucherman also observed that Ratti's left L2-3 (hip flexors) were 4/5 with give-way weakness; left L4 (quadriceps) strength was 4/5 with give-way weakness; left L5 (ankle dorsiflexors) strength was 4/5 with give-way weakness; and left S1 (plantar flexor) strength was 4/5 with give-way weakness.  AR 520.

Zucherman diagnosed Ratti with disc protrusion with radiculopathy in the lumbar spine, chronic pain, left hip osteoarthritis, and left shoulder degenerative joint disease.  AR 519.  He thereafter opined that Ratti was "highly disabled" and that her symptoms were "consistent with left-sided lumbar radiculopathy."  AR 519.  Zucherman opined that Ratti was "difficult to evaluate due to a fair amount of pain behavior," the cause of which needed to be clarified since it could be due to lumbar lower disc disease.  AR 519.

### e.  West Bay Orthopedic Medical Group

Ratti received treatment from the West Bay Orthopedic Medical group from May 2010 through April 2011 for various complaints including neck, shoulder and back pain, and for pain medication refills.  AR 469-73.  On July 7, 2010, E. Guzman saw Ratti to review right shoulder MRI findings.  Guzman observed that Ratti experienced only temporary relief from an injection.  AR 472.  Guzman also observed that Ratti had a probable partial rotator cuff tear (the other conditions are illegible) and the plan was to continue Ratti on her current prescriptions.  AR 472.

### f.  San Mateo Medical Center

Ratti sought treatment from April 2013 to August 2013 at San Mateo Medical Center, mainly for chronic pain, medication refills, and related mental health issues.

On April 3, 2013, Ratti went to the emergency room complaining of lower back pain that was exacerbated for one month.  AR 561.  Ratti reported sharp shooting pain over her left lower back radiating to her left thigh and lower leg, and explained that the pain was worse with prolonged sitting and walking, and was better at night.  AR 561.  Ratti was diagnosed with chronic low back pain, and discharged with pain medications.  AR 563.

On April 17, 2013, Ratti went to the emergency room complaining of back pain, and requested refills for pain medication for chronic back pain.  AR 557.  Ratti was diagnosed with back pain and discharged with pain medications.  AR 560.

On May 22, 2013, Nurse Practitioner Sara Okabayashi-Williams saw Ratti for chronic pain and pain medication refills. AR 552. The treatment notes state that Ratti had anxiety disorder, as well as lumbar disc displacement and osteoarthros NOS-pelvis. AR 541, 55. Upon general examination, Ratti presented as uncomfortable, anxious, and in obvious pain. AR 554. Okabayashi-Williams continued Ratti on Xanax to address anxiety disorder and discussed the use of other medications for anxiety. AR 555.

On June 20, 2013, Dr. Johanna Wolgast saw Ratti for a follow-up visit after Ratti missed an appointment for lab work. AR 546. On this visit, Ratti presented with burning pain in her middle back. AR 546. Ratti reported that she "really felt best on [O]xycotin 80mg," and was unhappy that she was limited to 45 pills of Soma per month. AR 547. Ratti also reported that she took Xanax for anxiety attacks, and also took two pills at night to sleep and one pill during the day for anxiety. AR 547. The treatment notes state that Ratti had anxiety disorder, as well as lumbar disc displacement and osteoarthros NOS-pelvis. AR 541. Upon general examination, Ratti presented with an "unhappy, somewhat pathetic presentation." AR 550. Upon a neurological exam, Ratti presented with (1) a normal if tentative heel-and-toe walk, but resisted standing up straight because it was too painful; (2) localized pain in the middle lower back and lower thoracic region; and (3) an antalgic gait with a cane. AR 550. Wolgast diagnosed Ratti with chronic pain syndrome, anxiety disorder, pain in limb, opioid dependence, sedative dependence, low back syndrome, insomnia, and blurred vision NOS. AR 550. Regarding anxiety disorder, Wolgast noted that she explained to Ratti why she did not recommend daily Xanax and planned to ultimately taper her off. AR 550-51. Regarding chronic pain syndrome, Wolgast continued Ratti on pain medications (Carisoprodol, Gabapentin, and Soma). AR 551.

On June 26, 2013, Ratti underwent a neuropsychological evaluation performed by Dr. Joshua Vanderschaaf related to pain and cognitive complaints affecting her work. AR 537. Ratti presented with a history of anxiety and anxiety attacks. AR 537. She reported that she was afraid when people came close to her in a fast maneuver. AR 537. Ratti explained that she had been prescribed Xanax for anxiety attacks, which she found to be "quite helpful." AR 537. Ratti also tearfully reported she felt totally depressed and that she just wanted to stay in bed all day, had

trouble sleeping, and had gained 50 pounds.  AR 540.  The treatment notes state that Ratti had

anxiety disorder, as well as lumbar disc displacement and osteoarthros NOS-pelvis.  AR 541.

Upon general examination, Vanderschaaf observed that Ratti's mood was depressed and

her affect was tearful and labile.  AR 543.  He also observed that Ratti presented as "slightly

scattered in her reported history and [had] difficulty getting to the point or summarizing her

concerns."  AR 543.  He noted that Ratti "frequently jump[ed] from topic to topic and [was] also

quite tearful in discuss[ing] her various depression and anxiety related symptoms."  AR 543.

As part of the neuropsychological evaluation, Vanderschaaf administered three tests: Beck

Anxiety Inventory (BAI); Beck Depression Inventory-2 (BDI-2), and Test of Memory

Malingering (TOMM).  Regarding the BAI test, Ratti's raw score was 48 suggesting "severe

depression."  AR 544.  Regarding the BD1-2 test, Ratti's raw score was 27 suggesting "severe

anxiety."  AR 544.  Regarding the TOMM test, Vanderschaaf observed that Ratti took the

"extraordinar[y] length of 45 minutes to complete the test."  Because Ratti failed trials 1 and 2,

Vanderschaaf noted that "there were concerns about her overall level of effort and cooperation,"

and discontinued further neuropsychological assessment.  AR 542.

Vanderschaaf opined that Ratti met the criteria for mood disorder NOS, and anxiety NOS

(primary).  AR 545.  He observed that "although [Ratti had] reported severe depression and

anxiety on face-valid, self-report measures, [she had] not had any treatment for such disorders."

AR 546.  He also observed that it was "unclear . . . without additional personality assessment that

[Ratti's] level of depression and anxiety would necessarily be disabling in terms of her ability to

work."  AR 545.

On July 19, 2013, Ratti saw Wolgast for pain medication refills.  AR 533.  Wolgast noted

that Ratti was diagnosed with anxiety disorder and depressive disorder.  AR 533-34.  Upon

general examination, Wolgast observed that Ratti's exam, affect, gait, and mannerisms all

suggested pathos, a sense of helplessness, passivity, and an inability to be held accountable even

for her own history.  AR 535.  Wolgast also observed "frank evidence of oversedation though

[Ratti's] affect [was] quite flat and depressed with tears."  AR 535.  Wolgast diagnosed Ratti with

lumbar disc displacement, osteoarthros NOS- Pelvis, and depressive disorder – NEC, possibly

personality disorder.  AR 535.  Wolgast continued Ratti on Cymbalta for depressive disorder.  AR 536.  Wolgast also continued Ratti on Xanax for panic attacks.  AR 536.

On August 29, 2013, Wolgast saw Ratti for a routine gynecological exam.  AR 744.  Wolgast observed that there were "no new records supporting [Ratti's] history of severe ongoing pain from back pathology."  AR 744.  Wolgast noted that Ratti "continue[d] to reference pill bottles as evidence of past diagnoses," and kept saying: "I'm not taking anything," but appeared to stop and consider that statement when Wolgast reminded Ratti of her Soma and Vicodin prescriptions.  AR 744.  Ratti reported poor sleep and that "those pills [Wolgast] gave her [did] NOTHING for [her]."  AR 744.  Upon general examination, Wolgast observed that although Ratti was not in acute distress, she complained of pain constantly throughout the visit, even when lying down or getting the breast exam, and more later when she was sitting in a chair when Wolgast was discussing the plan for Ratti's pain complaints.  AR 744.  Wolgast assessed Ratti with depressive disorder-NEC and chronic pain syndrome. AR 745.  Regarding depression, Wolgast observed that although Ratti appeared to be unhappy, her "presentation [did] not appear completely sincere," and there was not "a clear diagnosis evident at [that] time."  A.R 745.  Regarding chronic pain syndrome, Wolgast discontinued or reduced Ratti's dosage of Xanax, MS Contin, Gabapentin, and Trazodone.  AR 745.  Wolgast continued the Carisoprodol and Hydrocodone prescriptions.  AR 745.  Wolgast opined that she thought that Ratti needed a "full evaluation of all her various meds, many of which [Ratti] may not be even be taking (per history)."  AR 745.  Wolgast further opined: "Per Vanderschaaf, strong suspicion of malingering."  AR 745.  Wolgast referred Ratti to pain management for the following reason: "Relatively new patient with multiple sources of pain, poor history, poor documentation, already referred to interface, suspicion of malingering based on neuropsych evaluation with Vanderschaaf [.] I will be tapering her off Vicodin and Soma, see long list of other meds recently prescribed."  AR 745.

### g.    Pain and Rehabilitative Consultants Medical Group

Records from July 2013 through January 2014 document the medical review conducted for purposes of Ratti's workers' compensation claim.  It appears that some of the records cited by the ALJ are summaries of medical records made by qualified medical examiner Revels Cayton, M.D.

14

(e.g., an evaluation by Dr. Robert Steiner, summarized by Cayton at AR 575-76).

Steiner examined Ratti on March 6, 2013 for left shoulder, left hip, and low back complaints. AR 575. Steiner diagnosed Ratti with 1) adhesive capsulitis left shoulder, status post surgery; 2) osteoarthritis left hip; and 3) back pain and diskogenic sciatica. AR 575. Upon physical examination, Steiner observed that Ratti was in obvious distress and ambulated with a cane on the right to protect her injured and symptomatic left hip. AR 575.

Steiner opined that Ratti's hip confined her to ambulation with a cane; loss of facility to weightbear, stand, and walk; and to sitting half the time. AR 575. Steiner also opined that Ratti's shoulder precluded her from use at or above the shoulder level, forceful push-pull activities, and heavy lifting, anticipating that Ratti could lift 15 pounds on an occasional basis from the waist level. AR 575. Steiner also opined that Ratti's back limited Ratti to light work, with a 25 pound lifting restriction from the waist level. AR 575-76.

Regarding Ratti's future medical care, Steiner opined that pain management, suggested by Dixit, should be included and "certainly seem[ed] reasonable;" that Ratti will require the use of a cane and medication for her left hip and would need a total left hip replacement eventually; that Ratti's left shoulder surgery should be considered only with the condition that physical therapy must start immediately following the surgery and continue for 24 physical therapy visits at a minimum; and that Ratti may need surgery on her lower back since the steroid epidural injection was not particularly beneficial. AR 576.

Regarding Ratti's vocational rehabilitation, Steiner opined that it was apparent that Ratti could not go back to her job as noted. AR 576. Steiner also opined that despite the fact that a functional capacity evaluation should be performed to see if she could return to the work force with her combination of injuries, "[i]t would appear as though from a practical standpoint, she is totally disabled." AR 576.

In his conclusion, Steiner opined that "Ratti ha[d] reached maximum medical improvement and [wa]s permanent and stationary for rating purposes with the appropriate provisions provided for future medical care." AR 576.

The workers' compensation file also includes a report by Babak Jamasbi, M.D. Jamasbi

conducted an in-person evaluation of Ratti on July 10, 2013. AR 638-652. He reviewed medical

records, took a patient history, and conducted psychological testing. Based on his psychological

testing and clinical assessment of Ratti, Jamasbi observed that she was "experiencing significant

psychological issues, which [were] more likely contributing to her chronic pain syndrome." He

noted that her "intake of opioid type medication is very problematic." AR 651. Jamasbi opined

the following about the pain experienced by Ratti:

> In summary, I believe this woman is in a lot of pain and I believe her medications are not being adequately managed. She is receiving multiple opioids from multiple physicians and is not very clear on how to take these medications and what they are exactly for and the contents of these medications. In addition, she appears to be in a great deal of pain despite the fact that she is taking these medications ... I told her that best solution is to put her through a detox program and then a functional restoration program and wean her off all opioid medications ... At the present time, my recommendation is authorization for 2 weeks of a detox program and a 6 week functional restoration program. [M]y office will not be able to prescribe any opioid type medications until the above treatment recommendation has been performed.

AR 651-52.

### h. Henry Low, M.D.

Ratti saw Dr. Henry Low from April 9, 2014 to July 3, 2014 and August 29, 2014 to

January 16, 2015, primarily for lower back pain, hip pain, occasional knee pain, and pain

medication refills. AR 736-42, 747-55. Low diagnosed Ratti with anxiety disorder and chronic

pain syndrome, as well as back disorders. AR 736-42, 747-55. Low's treatment plans generally

continued Ratti on pain medications and made two referrals to spine surgery in July and

September 2014, and a referral to a pain clinic in January 2015. AR 737, 748, 752.

### 2. Consultative Examiner John Maris, Ph.D.

John Maris, Ph.D. conducted a consultative psychiatric evaluation of Ratti on January 25,

2013. AR 480-84. On the day of the exam, Maris observed that Ratti was unable to ambulate

without the assistance of her cane and moved very slowly, and had impaired gross motor

functioning. Her facial expression was blunted and she seemed sedated as if drugged. AR 480.

Ratti's chief complaints were panic attacks and depression. AR 480. Maris noted that Ratti was

taking Cymbalta and Oxycodone, and "appear[ed] to be sedated as a result of the pain medication

16

1　Oxycodone." AR 481.  Maris also noted that Ratti said that she could no longer work because she

2　could not concentrate and loses her focus and forgets things easily.  AR 482.

3　　　　Maris conducted a mental status examination in which he observed that Ratti "seem[ed]

4　preoccupied with negative themes with her own physical pain and discomfort," but her "thought

5　processes appear[ed] to be normal, rational, and organized."  AR 482.  Maris also observed that

6　Ratti's mood was dysphoric and/or sedated, and that her affect was sedated.  AR 482.  Maris also

7　observed that Ratti's memory was poor as indicated by the three-word delayed recall and her

8　inability to remember a single word after a two-minute delay.  AR 483.  Maris also observed that

9　Ratti's attention was poor.  AR 483.  Ratti recited three digits forward correctly, but only recited

10　one digit correctly in reverse order.  AR 483.

11　　　　Maris diagnosed Ratti with major depressive disorder, panic disorder (rule out opioid

12　abuse), orthopedic problems, and diminishing financial resources.  AR 483.  Maris assigned Ratti

13　a GAF[2] score of 51.  AR 483.  Maris's prognosis of Ratti was that she "appeared to be medically

14　sedated during the interview, "probably as a result" of the Oxycodone she takes for her pain; that

15　her functional level appeared to be inadequate with a significant mental health impairment; the

16　degree of her mental health functioning appeared to be moderately to severely impaired with a

17　concomitant mental health history; and her current functional impairment was related to her

18　depression and panic issues.  AR 483-84.

19　　　　Given this diagnoses and assessment, Maris opined the following: Ratti was currently

20　incapable of managing her own funds; unable to adequately perform one or two step simple and

21　repetitive tasks; has poor ability to accept instructions from supervisors and interact with co-

22　workers and the public due to the symptoms of depression, and anxiety, specifically poor

23

24　[2] "GAF" stands for Global Assessment of Functioning.  The Ninth Circuit recently noted that GAF
scores, which are " 'a rough estimate of an individual's psychological, social, and occupational
25　functioning used to reflect the individual's need for treatment,'" "may be a useful measurement."
*Garrison v. Colvin*, 759 F.3d 995, 1002, n.4 (9th Cir. 2014) (quoting *Vargas v. Lambert*, 159 F.3d
26　1161, 1164 n.2 (9th Cir. 1998) (quotation marks omitted)).  A GAF score between 41 and 50
"describes 'serious symptoms' or 'any serious impairment in social, occupational, or school
27　functioning."  *Id*. (internal citations omitted).  A GAF score between 51 to 60 "describes
'moderate symptoms' or any moderate difficulty in social, occupational, or school functioning.'"
28　*Id*. (internal citations omitted).

concentration and focus, impaired memory, low self-esteem, lack of energy and motivation, and emotional dysregulation; has poor ability to maintain regular attendance in the workplace; has poor ability to complete a normal workday or workweek without interruptions from her psychiatric conditions; and is unable to deal with the usual stresses encountered in a competitive workplace. AR 484.

### 3. Non-Examining State Agency Medical Consultants

#### a. Sandip Sen, M.D.

Sandip Sen, M.D., a state agency medical consultant, performed a mental RFC assessment based on a review of the medical records. Sen assessed Ratti as having moderate limitations in understanding and memory, sustained concentration and persistence, social interactions, and adaptation skills. AR 127-29. Sen found that Ratti was able to meet the basic mental and emotional demands of simple repetitive work including the ability to perform the following tasks on a sustained basis: 1) understand, remember, and carry out simple instructions; 2) make simple work-related decisions and abide by a schedule; 3) respond appropriately to supervision, co-workers, and tolerate brief social interaction in the workplace with limited customer and general public contact; and 4) deal with basic work demands, changes in a work routine, and cope with minor work stressors. AR 129.

#### b. Nalini Zella, M.D.

Nalini Zella, M.D., a state agency medical consultant, performed an RFC assessment based on a review of the medical records. Zella assessed Ratti as having exertional, postural, and manipulative limitations. AR 125-126.

Specifically, Zella assessed Ratti with the following exertional limitations: occasionally[3] lifting and/or carrying (including upward pulling) 20 pounds; frequently[4] lifting and/or carrying (including upward pulling) 10 pounds; standing and/or walking with normal breaks for 4 hours; sitting with normal breaks for 6 hours in an 8 hour day; and unlimited pushing and/or pulling

---

[3] Occasionally is defined as "cumulatively 1/3 or less of an 8 hour day." AR 125.

[4] Frequently is defined as "cumulatively more than 1/3 up to 2/3 of an 8 hour day." AR 125.

(including operation of hand and/or foot controls) for lifting and/or carrying.  AR 125.  Zella based these exertional limitations on the fact that Ratti used a cane for prolonged ambulation.  AR 125.

Zella assessed Ratti with the following postural limitations: frequently climbing ramps/stairs; occasionally climbing ladders/ropes/scaffolds; frequently balancing; frequently stooping, i.e., bending at the waist; frequently kneeling; frequently crouching, i.e., bending at the knees; and frequently crawling.  AR 126.  Zella based these postural limitations on evidence in the medical records of Ratti's status following left shoulder rotator cuff surgery, DDD (Degenerative Disc Disease) of the lumbar spine; obesity, and trochanteric bursitis of her left hip.  AR 126.

Zella assessed Ratti with the following manipulative limitations: limited left overhead reaching; and unlimited handling (gross manipulation), fingering (fine manipulation), and feeling (skin receptors).  AR 126.  Zella based these manipulative limitations on evidence of LUE (left upper extremity)-reaching overhead limited to frequently.  AR 126.

Lastly, Zella observed that although Ratti alleged severe functional limitations, that they were not supported by the objective medical and that "[s]ome of the physical limitations seem to be related to her anxiety."  AR 127.  Additionally, Zella gave partial weight to the opinion of treating physician Dixit, because the opinion was "not supported by the objective evidence."  AR 127.  Zella also noted the opinion of an unnamed examining source, but characterized it as a "snapshot CE with overestimation of limitations."  AR 127.

### C.  Vocational Expert Testimony

At the hearing, the VE categorized Ratti's past work history as follows: customer service representative, DOT code 249.362-026, with an sedentary exertional level and a SVP[5] of 4; home

---

[5] "'SVP' refers to the 'specific vocational preparation' level which is defined in the DOT as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1230, n.4 (9th Cir. 2009) (quoting *Dictionary of Occupational Titles*, Appendix C, p.1009 (4th ed. 1991)). "'The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 C.F.R. 404.1568 and 416.968, unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the DOT.'" *Bray*, 554 F.3d at 1230, n.4 (quoting *Policy Interpretation Ruling: Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in*

1    health aide, DOT code 354.377-014, with a medium exertional level, and a SVP of 3; and food

2    and beverage order clerk, DOT code 209.567-014, with a sedentary exertional level and a SVP of

3    2. AR 64.

4         The ALJ posed two cumulative hypotheticals to the VE to determine what jobs an

5    individual with Ratti's restrictions could perform. To start, the ALJ posed the following

6    hypothetical: an individual of Ratti's age and education with the past jobs the VE described; who

7    is limited to performing work at a light exertional level, but cannot climb ladders, ropes, and

8    scaffolds; who can perform other postural maneuvers such as stooping, crouching, and crawling

9    on an occasional basis; who can stand and walk for up to four hours during an eight-hour

10   workday; who would need a cane for any prolonged ambulation; who would be limited to

11   occasional overhead reaching and no forceful pushing and pulling of upper extremities; who

12   would be limited to performing only simple, routine tasks where there is little decision-making

13   and any decision-making would be simple and with minimal social interaction. AR 65. The VE

14   testified that an individual with such restrictions would be unable to perform Ratti's past work.

15   AR 65. However, she testified that an individual with these restrictions would be able to perform

16   work as a document preparer, DOT code 249.587-018, which is unskilled work, has a sedentary

17   exertional level, and has a SVP of 2. AR 65. In response to the ALJ's question, the VE further

18   testified that an individual with such restrictions would be able to perform the following two jobs

19   at the light exertional level: 1) office helper, DOT code 239.567-.010, which is unskilled work,

20   and has a SVP of 2; and 2) bench assembler, DOT code 739.687-030, which is unskilled work,

21   and has a SVP of 2. AR 66. According to the VE, while the four hours of standing is not

22   discussed in the DOT job descriptions, these two jobs offer a sit/stand option, which would

23   accommodate a four hour sitting and standing restriction. AR 66-67.

24        The ALJ then posed a second hypothetical which included the first, but added the

25   following restriction: the individual would be off task for approximately 20 percent of the day.

26   AR 67. The VE testified that an individual with these restrictions would not be able to perform

27

28   *Disability Decisions*, SSR 00-4P (S.S.A. Dec. 4, 2000)).

any work, and would be unable to complete a normal workday and the tasks as required. AR 67. The VE further testified that all of her opinions were consistent with the DOT's job descriptions. AR 67.

Ratti's attorney then posed a series of questions to the VE based on the ALJ's hypotheticals. Ratti's attorney modified the ALJ's first hypothetical with the following changes to certain restrictions: the individual would be limited to two hours of standing and walking in an eight-hour workday, and to six hours of sitting in an eight-hour workday, but would need to switch positions every 10 to 15 minutes and be able to get up from a seated position; would not perform any overhead reaching or could only occasionally reach in front of her; and would be limited to occasional handling, fingering, and grabbing. AR 69. The VE testified that an individual with these restrictions would be unable to perform any of Ratti's past relevant work or the office helper and bench assembler jobs, which offered a sit/stand option. AR 69-70.

## IV.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a court "may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d

1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.     ISSUES PRESENTED

Ratti contends that the ALJ erred in 1) failing to assess chronic pain disorder and panic disorder as severe impairments at step two; 2) rejecting the opinions of treating physician Dixit and consultative examiner Maris; 3) assessing Ratti's credibility; (4) determining Ratti's RFC; and (5) failing to resolve discrepancies between the VE's testimony and the DOT job descriptions. Ratti requests that the court remand for payment of benefits because all three requirements of the "credit-as-true" rule are met as set forth in *Garrison v. Colvin*, 759 F.3d 995, 1020-21 (9th Cir. 2014).

Defendant cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## VI.    DISCUSSION

### A.  The ALJ's Evaluation of Chronic Pain Disorder and Panic Disorder

Ratti argues that the ALJ erred at step two by failing to consider chronic pain disorder and panic disorder as severe impairments.

At step two of the five-step sequential evaluation for disability claims, the ALJ must determine whether the claimant has one or more severe impairments that significantly limit a claimant's ability to perform basic work activities.  20 C.F.R. §§ 404.1520(a)(4)(ii) and (c); 416.920(a)(4)(ii) and (c).  A severe impairment is any impairment that has "more than a minimal effect on [the claimant's] ability to do work," *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), and "must be established by objective medical evidence from an acceptable medical source."  20 C.F.R. § 416.921.  In addition, when assessing a claimant's RFC, an ALJ must consider all of the claimant's medically determinable impairments, both severe and non-severe. §§ 416.920(e), 416.945; *see Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008); *see also* SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments [because] limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.").

The ALJ did not err in failing to consider panic disorder as a severe impairment because she found that anxiety disorder was a severe impairment. AR 25 (listing severe impairments as degenerative disk disease, left hip osteoarthrosis, left shoulder impingement, depression, and anxiety disorder). AR 27. Ratti does not address the difference, if any, between panic disorder and anxiety disorder in the context of the ALJ's decision. Moreover, Ratti does not articulate what significant limitations on her basic work abilities were caused by panic disorder as opposed to anxiety disorder. Therefore, the ALJ did not err by failing to consider panic disorder as a severe impairment.

Regarding chronic pain disorder, Ratti is correct that the ALJ erred in failing to consider chronic pain syndrome in the step two analysis. Several providers diagnosed Ratti with chronic pain syndrome. AR 519 (McGann), 550, 744-45 (Wolgast), 736-41, 747-55 (Low). However, the error is harmless at step two because Ratti advanced to the remaining steps of the five step disability analysis, and the ALJ discussed chronic pain symptoms in her RFC analysis. AR 29-30. The ALJ accurately observed that more recent treatment records, i.e., 2014-2015, showed that while Ratti continued to complain of back and hip pain, the pain was somewhat relieved and/or managed with medications. For example, on April 23, 2014, Ratti complained to Low of lower back pain that was not relieved with the current regimen of medications. AR 741. However, less than two weeks later, on May 8, 2014, Ratti told Low that the lower back pain and right hip pain were somewhat relieved with the current medication regimen. AR 740. On August 29, 2014, Ratti reported to Low that she took Naproxen with her pain medications and felt that her pain was very well controlled. AR 754. As of January 16, 2015, Ratti reported that she was doing well, even though her back and hip still "bothered" her. AR 747.

For these reasons, the ALJ did not err in not considering chronic pain syndrome and panic disorder at step two of the five-step sequential evaluation.

### B. The ALJ's Evaluation of Medical Evidence

Ratti argues that the ALJ erred in failing to provide specific and legitimate reasons for assigning little weight to Dixit's November 15, 2012 and April 4, 2013 RFC assessments and Maris's January 25, 2013 consultative evaluation.

### 1. Legal Standards

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id.*

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d

1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244. An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

#### a. Maris

Maris performed a consultative evaluation of Ratti on January 25, 2013. Maris opined that Ratti was incapable of managing her own funds; unable to adequately perform one or two step simple and repetitive tasks; had poor ability to accept instructions from supervisors and interact with co-workers and the public due to the symptoms of depression, and anxiety, specifically poor concentration and focus, impaired memory, low self-esteem, lack of energy and motivation, and emotional dysregulation; had poor ability to maintain regular attendance in the workplace; had poor ability to complete a normal workday or workweek without interruptions from her psychiatric conditions; and was unable to deal with the usual stresses encountered in a competitive workplace. AR 484.

The ALJ assigned little weight to Maris's opinion because she found that it was not consistent with the objective evidence, since there was a lack of treatment for Ratti's mental health impairments as well as some evidence of control through medication. AR 32.

Ratti contends that the ALJ erroneously "played doctor" and ignored substantial evidence in the record of a severe and disabling level of psychological impairment. According to Ratti, Maris's opinions are consistent with his own objective findings as well as additional objective evidence in the record. Ratti further argues that there is substantial evidence in the record that Ratti's pain medications were mismanaged. Specifically, Maris noted that Ratti appeared to be sedated, had daily depression for four years and severe symptoms of anxiety and depression, and that upon examination, her overall attention and memory were poor. AR 481-82. According to

Ratti, the records from the Castro Community Health Network, a 2010 record from San Francisco Orthopedic Surgeons Medical Group, the results of a July 26, 2013 neuropsychological exam, the results of three psychological tests conducted in July 2013, and a July 19, 2013 visit with Wolgast show similar evidence of disabling mental impairment. *See, e.g.*, AR 323-26 (Castro Community Health Network), 447 (McGann), 535-36 (Wolgast), 543-44 (Vanderschaaf), 731 (Jamasbi).

Since Maris's opinion is contradicted by those of non-examining physician Sen, who opined that Ratti was able to meet the basic mental and emotional demands of simple repetitive work, *see* AR 129, and non-examining physician Zella, who opined that Ratti had more exertional, postural, and manipulative capabilities such that she could perform a broader array of tasks in an 8-hour workday, *see* AR 125-126, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to discount Maris's opinions. *See Lester*, 81 F.3d at 830.

Having reviewed the entire record, the court finds that the ALJ provided specific and legitimate reasons for assigning little weight to Maris's January 25, 2013 opinion that are supported by substantial evidence. Specifically, while the record contains medical evidence of a history of depression and anxiety, the ALJ accurately observed that the overall arc of the medical evidence showed that Ratti did not receive any treatment for these conditions other than medication, and that these medications appeared to help according to a 2015 treatment record. Accordingly, there is substantial evidence to support the ALJ's rejection of Maris's opinion as inconsistent with the overall trajectory of the medical evidence.

Regarding depression, the ALJ found that the record showed a history of depression, treated with medication and no other additional treatment. AR 31 (citing to AR 254, 286, 431, 532, 580, 650). Specifically, at a March 21, 2012 visit, McGann noted that Ratti was quite slow to move, quite deliberate, and "appeared" depressed in speaking, but that her affect was appropriate and some of her responses "appear[ed] somewhat exaggerated." AR 31, 431. McGann opined that Ratti's "overall clinical picture" included "what appear[ed] to be depression." AR 31, 431. On July 10, 2013, Ratti saw Jamasbi, who noted that Ratti had "severe depression and anxiety from her injury and discomfort all of the time." AR 31, 580. At this visit, Jamasbi conducted

26

three psychological tests, i.e., SCL-90-R, Pain Patient Profile, and Milton Behavioral Medicine Diagnostic, which all showed an increase in depression and anxiety scores.  AR 31, 650.  Based on his clinical assessment of Ratti and the psychological testing, Jamasbi thereafter opined that Ratti was "experiencing significant psychological issues which [were] most likely contributing to her chronic pain syndrome."  AR 31, 650.  At a July 19, 2013 follow-up visit, Wolgost noted that Ratti was seen in the interim by Vanderschaaf and scored high on the depression test, but the TOMM score suggested poor effort.  AR 31, 532.  Lastly, Ratti listed Cymbalta as the medication prescribed for depression on two-disability related documents.  *See* AR 31, 254, 286.  The ALJ correctly observed that there is no evidence of additional treatment for depression in the record, aside from medication.

Regarding anxiety, the ALJ found that Ratti was diagnosed with anxiety disorder in May 2013, and that there was evidence that Ratti took Xanax, which helped with the anxiety symptoms. AR 31 (citing to 286, 555, 740).  Specifically, on May 22, 2013, which appears to be the earliest diagnosis of anxiety disorder in the record, Okabayashi-Williams  diagnosed Ratti with anxiety disorder, and continued Ratti on Xanax to address anxiety disorder.  AR 555.  On January 16, 2015, Low assessed Ratti with anxiety disorder, observed that Ratti's "current medication [i.e., Xanax] was helping with anxiety," and refilled the Xanax prescription.  AR 747-48.[6]  Ratti also listed Xanax as a medication for anxiety on a self-reported disability report.  AR 286.

Contrary to Ratti's contention, the ALJ considered Jamasbi's July 10, 2013 examining report, Wolgast's July 19, 2013 treatment record, and portions of Vanderschaaf's June 26, 2013 treatment record as referenced in Wolgast's July 19, 2013 treatment record.  AR 31.  The ALJ concluded that these records, along with others, showed a history of depression that Ratti treated with medication only.  AR 31 (citing to AR 532 (Wolgast July 19, 2013 treatment record referencing Vanderschaarf's June 26, 2013 treatment), 650 (Jamasbi's July 10, 2013 examining

---

[6] In her discussion of Ratti's anxiety, the ALJ stated that Ratti was assessed with anxiety disorder as recently as May 2014.  AR 740.  However, the record shows that Low assessed Ratti with anxiety disorder as recently as January 16, 2015 which is the last treatment record for Low.  AR 747. .

report).[7] The fact that ALJ did not specifically address all of the findings in these records, without more, is not error. "[I]n interpreting the evidence and developing the record, the ALJ does not need to 'discuss every piece of evidence.'" *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).

Although the ALJ did not discuss the Castro Community Health Network records and the 2010 record from the San Francisco Orthopedic Surgeons Medical Group, the findings in these records appear to be cumulative of the other evidence upon which the ALJ relied. For example, the records from Castro Community Health Network show that Ratti sought treatment for various ailments including panic attacks, and requested and received pain medication refills. AR 323-29. Additionally, on April 29, 2010, McGann observed that Ratti's affect was "low" and "her mood seemed grossly depressed" upon examination and evaluation of Ratti for hip pain. AR 447.

To the extent that Ratti suggests that the ALJ should have concluded that Ratti's mental impairments were actually disabling, the fact that the ALJ interpreted the evidence differently from Ratti is not reversible error. While another ALJ may have reached a different conclusion on the same record, this court cannot substitute its judgment for that of the ALJ, as long as the ALJ's findings are supported by substantive evidence. *See Jamerson*, 112 F.3d at 1066.

Ratti also contends that the ALJ erred in discounting Maris's opinion because there was a lack of evidence of mental health treatment in the record. The Ninth Circuit has "particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" *See Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299–300 (9th Cir. 1999) (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)); *Nguyen*, 100 F.3d at 1465 (explaining that the "fact that claimant may be one of millions of people who did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that [the treater's] assessment of claimant's condition is inaccurate"). However, as discussed above, the ALJ did not base her

United States District Court
Northern District of California

---

[7] AR 650 and AR 731 are duplicates.

opinion on the lack of treatment alone.   There was substantial evidence to support ALJ's overall

evaluation of the medical evidence of Ratti's mental impairments, i.e., depression and anxiety,

and, accordingly, her rejection of Maris's opinions on the ground that it was not consistent with

the course of treatment for those impairments was supported as evident in more recent treatment

records.  *See, e.g., Warzecha v. Berryhill*, No. 14-35665, --- F. App'x ----,  2017 WL 2814421, at

*1 (9th Cir. June 28, 2017) (finding any error in relying on claimant's failure to seek treatment

was harmless where the ALJ properly relied on the opinions of nonexamining medical consultants,

which were supported by substantial evidence, to reject the opinion an examining physician).

In conclusion, the ALJ did not err in assigning little weight to Maris's January 25, 2013

opinion because she provided specific and legitimate reasons for doing so that were supported by

substantial evidence in the record.

### b.    Dixit

In his November 15, 2012 RFC assessment, treating physician Dixit opined that Ratti was

limited to sedentary work, could sit, stand or walk only 1 hour in a 8-hour workday, required

additional breaks and shifting positions in a 8-hour workday, needed to recline or lie down in

excess of three typical breaks in a 8-hour workday, and would need to be absent 3-4 times per

work as a result of her impairments.  AR 465.  Dixit's April 4, 2013 RFC assessment contained

substantially similar restrictions.  AR 515-16.

The ALJ assigned little weight to Dixit's November 15, 2012 and April 4, 2013 RFC

assessments because she found that they were overly restrictive in light of the objective medical

evidence and inconsistences in the record.

Ratti contends that the ALJ erred in failing to provide specific and legitimate reasons to

reject Dixit's RFC assessments.  According to Ratti, the ALJ ignored the fact that Dixit treated

Ratti for almost five years (December 2008 to April 2013) for lumbar spine radiculopathy,

degenerative disc disease, and left shoulder pain and consistently noted that Ratti's multiple

impairments rendered her unfit for work duty.  Additionally, Ratti argues that the ALJ cherry-

picked and misconstrued certain statements from Dixit's treatment records in order to create

inconsistences in the record.  Lastly, Ratti asserts that there is substantial evidence in the record of

Ratti's severe pain and impairments to support Dixit's November 2012 and April 2013 RFCs.

Since Dixit's opinions are contradicted by those of non-examining physician Sen who opined that Ratti was able to meet the basic mental and emotional demands of simple repetitive work, *see* AR 129, and non-examining physician Zella, who opined that Ratti had more exertional, postural, and manipulative capabilities such that she could perform a broader array of tasks in an 8-hour workday, *see* AR 125-126, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to discount Dixit's opinions. *See Lester*, 81 F.3d at 830.

Having reviewed the entire record, the ALJ provided specific and legitimate reasons for assigning little weight to Dixit's RFC assessments that are supported by substantial evidence. Specifically, while the medical evidence shows a history of back, hip, and shoulder problems including chronic/ongoing pain, the ALJ accurately observed that there are no records of treatment of shoulder and hip problems after 2013, and Ratti's hip and back pain were managed with medications according to 2014-2015 treatment records, of which there are few. The 2014-2015 treatment records are all from Low, and cover approximately 8 months of treatment in 2014 and one month of treatment in 2015 in 20 pages. *See, e.g.*, AR 735-42 (Low 4/9/14 - 7/3/14 treatment records), 747-55 (Low 8/29/14 - 1/16/15 treatment records). As discussed below, Low's records indicate that Ratti experienced improvement. Accordingly, there was substantial evidence to support the ALJ's rejection of Dixit's RFC assessments as inconsistent with the overall trajectory of the medical evidence of Ratti's back, hip, and shoulder problems.

The ALJ accurately summarized the relevant objective medical evidence of Ratti's back, hip, and shoulder problems. Regarding back problems, the ALJ found that Ratti had a history of back issues including lumbar spine radiculopathy and degenerative disc disease. *See* AR 29. The majority of the records cited by the ALJ are Dixit's records, which show a consistent diagnosis of lumbar spine radiculopathy and degenerative disc disease from 2011 through 2013. *See, e.g.*, 389 (3/30/11 diagnosis of left side degenerative disc disease); 387 (4/27/11 diagnosis of degenerative disc disease); 382 (8/4/11 diagnosis of low back pain); 371 (7/10/12 diagnosis of left side radiculopathy); 368 (10/16/12 diagnosis of left side radiculopathy); 370 (8/7/12 diagnosis of left

side degenerative disc disease); 488 (4/4/13 diagnosis of left side radiculopathy and degenerative disc disease).  Additionally, the ALJ also cited to various records from Low who consistently diagnosed Ratti with unspecified back disorders from April 2014 to January 2015 in response to complaints of lower back pain.  *See, e.g.*, AR 741 (4/23/14 diagnosis); 740 (5/8/14 diagnosis); 739 (5/21/14 diagnosis); 737 (7/3/14 diagnosis); 754 (8/29/14 diagnosis); 747 (1/16/15 diagnosis).  The ALJ accurately noted that Low observed that Ratti experienced some relief from back pain with medication in May 2014, that Ratti felt that her pain was very well controlled in August 2014, and that Ratti reported she was doing well in January 2015, even though her back was still bothering her.  *See, e.g*., AR 740 (5/8/14 treatment record: "Continues to have low back pain and R hip pain, which is somewhat relieved with current med regimen"); 754 (8/29/14 treatment record: "Pt here for follow up on pain management and would like a prescription for Naproxen 500 mg. Says she took some in addition with her pain medications and felt her pain was very well controlled.  Also wants a prescription for suboxone."); 747 (1/16/15 treatment record: "49 year female here for last visit before switching to a new provider. Pt here states she is doing well, but back is still bothering her.").

Regarding hip problems, the ALJ accurately observed that Ratti had a history of hip problems including hip pain, hip degenerative joint disease, and impingement.  AR 30.  The majority of the records cited by the ALJ are Dixit's records; they show a consistent diagnosis of hip degenerative joint disease and impingement from 2011 to 2013.  *See, e.g.*, AR 391 (1/19/11 diagnosis of left hip degenerative joint disease); 390 (2/16/11 diagnosis of left hip degenerative joint disease); 385 (5/25/11 diagnosis of right hip degenerative joint disease); 384 (6/22/11 diagnosis of left hip degenerative joint disease); 383 (7/14/11 diagnosis of left hip degenerative joint disease); 381 (9/1/11 diagnosis of left hip degenerative joint disease); 380 (9/29/11 diagnosis of left hip degenerative joint disease); 379 (10/24/11 diagnosis of left hip degenerative joint disease and impingement); 377 (12/8/11 diagnosis of left hip degenerative joint disease); 376 (1/10/12 diagnosis of left hip degenerative joint disease); 375 (2/2/12 diagnosis of left hip degenerative joint disease); 372 (6/14/12 diagnosis of left hip degenerative joint disease); 488 (4/4/13 diagnosis of left hip degenerative joint disease).  The ALJ also correctly found that despite

a history of hip pain, bursitis, and osteoarthritis, Ratti reported that her hip pain was somewhat relieved with medication in May 2014 and that she was doing well as recently as January 2015, even though she still complained of hip pain. *See* AR 30, 740 (Low 5/8/14 record), 747 (Low 1/16/15 record). The ALJ accurately noted that there were no records of bursitis or arthritis after July 2013. *See* AR 30, 731 (Jamasbi July 10, 2013 examining report).

Regarding shoulder problems, the ALJ correctly observed that there was medical evidence of a history of shoulder problems. AR 30. Specifically, Ratti underwent two surgeries on her left shoulder, a rotator cuff repair surgery in 2010, and what appears to be a bone spur removal surgery in 2011. AR 348, 350, 417. The ALJ also correctly noted that there were no specific references to shoulder problems after July 2013. None of the 2014-15 treatment records indicate that Ratti complained of ongoing shoulder problems. *See* AR 735-55 (Low treatment records). Ratti's arguments in rebuttal are unpersuasive for several reasons. The ALJ did not ignore the fact that Dixit treated Ratti for over five years (December 2008 to April 2013) for lumbar spine radiculopathy, degenerative disc disease, and shoulder pain. Although the ALJ did not specifically discuss the fact that Dixit was Ratti's long-time treatment provider for these conditions, the ALJ's analysis clearly shows that she understood Dixit's primary role in Ratti's care. Indeed, the vast majority of records cited by the ALJ in her discussion of the medical evidence, particularly of Ratti's hip and back problems, are Dixit's records.

While Ratti is correct that the ALJ did not discuss Dixit's finding that Ratti was not "fit for duty" this fact does not constitute error. The ALJ was not required to discuss every finding in her evaluation of the medical evidence. *See Howard*, 341 F.3d at 1012 (quoting *Black*, 143 F.3d at 386). To the extent the ALJ implicitly rejected Dixit's not "fit for duty" finding, there is substantial evidence to support her rejection. Dixit's finding for the 2008-13 time period reflect Dixit's impression of Ratti's various physical impairments at that time. For the period after April 2013 until the ALJ hearing in January 2015, there is substantial evidence that Ratti managed her pain with medications and may not have sought treatment for certain impairments. For example, there are no references to treatment for shoulder problems or hip bursitis or arthritis after July 2013. Additionally, as discussed above, in 2014-2015, Ratti reported to Low that she managed her

back and hip pain with medications.

While other evidence in the record cited by Ratti is consistent with Dixit's assessments, this evidence is limited to the 2010 to 2013 time period. For example, Ratti received treatment for hip pain from the providers at the San Francisco Orthopedic Surgeons Medical Group from April 2010 to September 2012. AR 424, 426, 433, 441-44, 447. Similarly, Ratti received treatment at San Mateo Medical Center from April 2013 to August 2013. AR 546, 550, 557, 560-61. The only evidence of Ratti's back and hip conditions in the 2014-2015 time period are the records from Low, which the ALJ cites.

Lastly, as discussed in the section addressing the ALJ's evaluation of Ratti's credibility, Ratti does not actually dispute that the ALJ correctly pointed out inconsistencies in the record. AR 31. Instead, Ratti argues that the ALJ exaggerated the importance of these inconsistencies and stresses that they should be viewed in the light of the record as a whole. However, the court cannot say that it was clearly erroneous for the ALJ to consider these inconsistencies in evaluating the medical record evidence, including Dixit's assessments.

In conclusion, the ALJ did not err in assigning little weight to Dixit's RFC assessments because she provided specific and legitimate reasons for doing so that were supported by substantial evidence in the record.

### D.     The ALJ's Evaluation of Ratti's Credibility

Ratti argues that the ALJ erred in assessing her credibility.

#### 1.     Legal Standards

In general, credibility determinations are the province of the ALJ. "It is the ALJ's role to resolve evidentiary conflicts. If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld." *Allen v. Sec'y of Health & Human Servs.*, 726 F.2d 1470, 1473 (9th Cir. 1984) (citations omitted). An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional impairment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) (citing 42 U.S.C. § 423(d)(5)(A)). However, if an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so. *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006). In evaluating a claimant's credibility, the ALJ

1  cannot rely on general findings, but "must specifically identify what testimony is credible and

2  what evidence undermines the claimant's complaints." *Id.* at 972 (quotations omitted); *see also*

3  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (ALJ must articulate reasons that are

4  "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit

5  claimant's testimony."). The ALJ may consider "ordinary techniques of credibility evaluation,"

6  including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also

7  consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek

8  treatment or to follow a prescribed course of treatment." *Smolen v. Chater*, 80 F.3d 1273, 1284

9  (9th Cir. 1996).

10       The determination of whether or not to accept a claimant's testimony regarding subjective

11  symptoms requires a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929; *Smolen*, 80 F.3d at 1281

12  (citations omitted). First, the ALJ must determine whether or not there is a medically

13  determinable impairment that reasonably could be expected to cause the claimant's symptoms. 20

14  C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82. Once a claimant produces

15  medical evidence of an underlying impairment, the ALJ may not discredit the claimant's

16  testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to

17  fully corroborate the alleged severity of" the symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 345

18  (9th Cir. 1991) (en banc) (citation omitted). Absent affirmative evidence that the claimant is

19  malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the

20  claimant's testimony. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The Ninth Circuit

21  has reaffirmed the "specific, clear and convincing" standard applicable to review of an ALJ's

22  decision to reject a claimant's testimony. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir.

23  2014).

24              **2.       Analysis**

25       The ALJ found that Ratti's "medically determinable impairments reasonably could be

26  expected to cause the alleged symptoms," but determined that Ratti's "statements concerning the

27  intensity, persistence, and limiting effects of these symptoms [were] not entirely credible." AR

28  31. According to the ALJ, the record contained "no credible evidence" that Ratti's impairments

34

were of the type or nature that would "preclude all employment" by Ratti and require a finding of disability. AR 31. In support, the ALJ pointed to inconsistencies in the record; Ratti's request for increasing amounts of pain medications and requests for early refills, suggesting "drug-seeking behavior," and the ALJ's evaluation of the medical opinion evidence. AR 31-32.

For the reasons discussed above, the ALJ did not err in assessing the medical opinions of Maris and Dixit. Notably, Ratti does not argue that the ALJ erred in evaluating the other medical opinion evidence.

The ALJ's other reasons for partially discrediting Ratti's testimony are supported by clear and convincing evidence. Specifically, there is consistent evidence in the record of Ratti requesting increased dosages of pain medications and early refills, suggesting drug-seeking behavior. *See, e.g.*, AR 323-29, 552, 555, 546-547, 469-73. On February 7, 2013, Dixit observed that Ratti was chronically dependent on pain medications and her requests for medication dosage had been increasing. AR 490-91, 582. Additionally, there is evidence in the record that at least one provider (Wolgast) strongly suspected that Ratti was malingering. AR 486, 745 While it is certainly possible that Ratti's increased requests for medical dosage and early refills are simply indicative of the severity of her pain, *see* AR 581 (Jamasbi July 10, 2013 examining report noting that Ratti is in a "lot of pain," her "medications are not being adequately managed" and she appears to be "in a great deal of pain despite the fact that she is taking these medications"), the court cannot substitute its judgment for that of the ALJ. *See Jamerson*, 112 F.3d at 1066 (explaining that if the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision).

Ratti does not dispute that the ALJ correctly identified inconsistencies in the record. Instead, Ratti argues that these alleged inconsistencies are exaggerated. While some inconsistencies appear to be minor, (e.g., Ratti's statement that she experienced a 72-pound weight gain when the record showed only a 54-pound weight gain, and her statement to a West Bay Orthopedic Medical group provider that she forgot to mention that her left shoulder was injured at work), some inconsistencies suggest that Ratti may be overstating symptoms and thus bear directly on her credibility. For example, in a March 12, 2012 treatment note, McGann observed,

upon examination, that some of Ratti's responses "appear[ed] somewhat exaggerated" and while

she "appear[ed] depressed . . . her affect seem[ed] appropriate." AR 431.  Additionally, in Maris's

January 25, 2013 examining report, Maris noted that Ratti seemed "preoccupied with negative

themes with her own physical pain and discomfort," but that her "thought processes appear to be

normal, rational, and organized." AR 482.  Furthermore, in a June 29, 2012 treatment note, Sikka

reported that Ratti complained about right back and hip pain which Ratti stated was caused by the

work-place injury at Walgreens.  AR 512.  Sikka, however, was unwilling to state that her

complaints were related to the incident at Walgreens since that event was a "significant time ago"

and it did not seem "medically likely . . . that these complaints would appear after . . . all this

time." AR 512.  Lastly, Ratti presented with the same complaints of tenderness in the

acromioclavicular joint and biciptal tendon and painful range of motion on abduction and flexion

in June 29, 2012 and August 10, 2012.  AR 507, 511.  While Ratti's range of motion was

restricted in June 29, 2012, her range of motion was within normal limits less than two months

later on August 10, 2012.  AR. 507.

Therefore, the ALJ did not err in her assessment of Ratti's credibility.

### E.    The ALJ's Evaluation of the RFC and the VE Testimony

Ratti argues that the ALJ erred in determining Ratti's RFC and failing to resolve the

discrepancies between the VE's testimony and the DOT job descriptions.  Both arguments are

unpersuasive.

Ratti premises her entire argument regarding the RFC on the ALJ's erroneous evaluation

of Maris's and Dixit's opinions, and the ALJ's alleged failure to evaluate chronic pain and panic

disorder as severe impairments.  As discussed above, the ALJ did not err in assigning little weight

to the Maris and Dixit opinions, or in not specifically considering chronic pain disorder as a severe

impairment at step two.  Accordingly, the court concludes that the ALJ did not err in determining

Ratti's RFC.

Ratti next contends that the ALJ failed to address the apparent conflict between the DOT

descriptions for the jobs of officer helper (DOT 239.567-010), bench assembler (DOT 739.687-

030), and small products assembler (DOT 706.684.022) on the one hand, and the VE's testimony

on the other. According to Ratti, the DOT descriptions for the officer helper, bench assembler, and small products assembler jobs require the ability to reach frequently or constantly, and, if the position involves sitting most of the time, some pushing and pulling of arms or leg controls. Ratti contends that these job descriptions are in conflict with the VE's testimony that a person with Ratti's RFC could perform these jobs because the ALJ specifically restricted Ratti to "occasional overhead reaching" and no "forceful pushing or pulling with the upper extremities." AR 28.

"[A]n [ALJ] may [not] rely on the testimony of a vocational expert regarding the requirements of a particular job without first inquiring whether that expert's testimony conflicts with the [DOT]." *Massachi v. Astrue*, 486 F.3d 1149, 1150 (9th Cir. 2007). The obligation to ask about the existence of a conflict stems from SSR 00-4p, which requires an ALJ to identify and elicit an explanation for any conflict between a VE's testimony and the information in the DOT. *Id.* at 1152-1153. When there is a conflict, compliance with SSR 00-4p "ensure[s] that the record is clear as to why an ALJ relied on a vocational expert's testimony . . . ." *Id.* at 1153. To comply with SSR 00-4p, "the ALJ must first determine whether a conflict exists. If it does, the ALJ must then determine whether the vocational expert's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the [DOT]." *Id.* Failing to ask whether there is a conflict between the VE's testimony and the DOT is harmless error where there is no apparent conflict or where the VE explained the reason for the deviation. *Id.* at 1154, n.19. If the ALJ does not comply with SSR 00-4p, then a reviewing court "cannot determine whether substantial evidence supports the ALJ's step-five finding that [claimant] could perform other work." *Id.* at 1154.

Here, there is no apparent conflict between the DOT descriptions and the VE's testimony that an individual with restrictions of "occasional overhead reaching" and no "forceful pushing or pulling with the upper extremities" could perform those jobs. None of the DOT descriptions specify "overhead" reaching, which the ALJ restricted to occasional, as opposed to reaching in general directions. Nor do any of the DOT descriptions suggest that that the overhead reaching in any of these positions would be more than occasional. Furthermore, none of the DOT descriptions describe any need for "forceful" pushing or pulling of arm or leg controls. Additionally, even

assuming there was an apparent conflict between the DOT descriptions and the VE's testimony, the ALJ properly resolved that conflict by asking the VE whether her testimony was consistent with the DOT, to which the VE replied, "correct." AR 67; *see also* AR 35 (explaining that "[p]ursuant to SSR 00-04P, the undersigned has determined that the VE's testimony is consistent with the [DOT] . . . .").

Accordingly, the court cannot find that the ALJ erred in this respect.

## VII. CONCLUSION

In conclusion, the court denies Ratti's motion for summary judgment, and grants the Commissioner's cross-motion for summary judgment.

**IT IS SO ORDERED.**

Dated: September 30, 2017



Donna M. Ryu
United States Magistrate Judge